# United States Court of Appeals
## For the First Circuit

No. 16-2214

DAVID PAGÁN-GONZÁLEZ, et al.,

Plaintiffs, Appellants,

v.

ANA MORENO, et al.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Gustavo A. Gelpí, Jr., U.S. District Judge]

Before

Torruella, Lipez, and Barron,
Circuit Judges.

Osvaldo Carlo-Linares, with whom Carlo Law Office, LLC was on brief, for appellants.
Joseph F. Busa, Attorney, Appellate Staff, Civil Division, U.S. Department of Justice, with whom Chad A. Readler, Acting Assistant Attorney General, Rosa Emilia Rodríguez-Vélez, United States Attorney, and Mark B. Stern, Attorney, Appellate Staff, Civil Division, U.S. Department of Justice, were on brief, for appellees.

March 22, 2019

**LIPEZ**, **Circuit Judge**.  This case requires us to consider the constitutional boundaries for the use of deception by law enforcement officers seeking consent for a warrantless search.  We conclude that the search at issue here violated the Fourth Amendment because the circumstances -- including a lie that conveyed the need for urgent action to address a pressing threat to person or property -- vitiated the consent given by appellants.  We further hold that the defendants are not entitled to qualified immunity from civil liability for the unlawful search because any reasonable officer would have recognized that the circumstances were impermissibly coercive.  However, we reject a related claim alleging malicious prosecution on the ground that, even if it had merit, the defendants would be entitled to qualified immunity.

We therefore vacate in part and affirm in part the district court's grant of defendants' motion to dismiss plaintiffs' complaint.

## I. Background

Appellant David Págan-González claims that his Fourth Amendment rights were violated when federal agents unlawfully searched his computer, and when they subsequently arrested and detained him on child pornography charges based solely on the evidence obtained in the unlawful search.  After the criminal charges were dropped, Pagán-González brought this suit for damages pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau

of Narcotics, 403 U.S. 388 (1971).[1]  In Part A, we recount the largely undisputed facts of the underlying events, setting forth the complaint's well-pleaded facts in the light most favorable to the plaintiff.  See Germanowski v. Harris, 854 F.3d 68, 69 (1st Cir. 2017); Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 7 (1st Cir. 2011).  In describing the objectives and conduct of the defendant law enforcement officers, we also rely on an affidavit submitted by one of the agents in support of the criminal complaint against Pagán-González.[2]  In Part B, we describe the Bivens action and the district court's rationales for dismissing it.

**A. The Challenged Conduct and Criminal Process**

On October 23, 2013, approximately ten federal agents appeared at the door of the home shared by Pagán-González and his

---

[1] A Bivens claim is an implied cause of action for civil damages against federal officials that we treat for qualified immunity purposes as equivalent to the statutory cause of action against state officials provided by 42 U.S.C. § 1983.  See Hernandez-Cuevas v. Taylor, 723 F.3d 91, 93 n.1 (1st Cir. 2013); see also Pearson v. Callahan, 555 U.S. 223, 238 n.1 (2009) (noting parenthetically that "the Court's decisions equate the qualified immunity of state officials sued under 42 U.S.C. § 1983 with the immunity of federal officers sued directly under the Constitution" in a Bivens action (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 & n.30 (1982)).

[2] The criminal complaint and affidavit were attached as exhibits to appellant's civil complaint.  See, e.g., Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 72 (1st Cir. 2014) (stating that, in reviewing a motion to dismiss for failure to state a claim, courts consider "the complaint, documents attached to it, and documents expressly incorporated into it").

parents in Cabo Rojo, Puerto Rico. Special Agent Ana Moreno, one of two officers named as defendants,[3] identified herself as an FBI agent and reported that the law enforcement officers were there because a modem in a computer at the house was "sending a signal and/or viruses to computers in Washington." In fact, an FBI agent had downloaded child pornography from a computer that agents believed was located at that address, and the agents had come to the home to investigate.

The agents asked the family for consent to inspect their computers and said they would try to fix the modem that was sending transmissions to Washington. The agents explained that, if they could not make the repair, they would take the faulty computer and provide a replacement at the FBI's expense. Pagán-González, age 21, and his parents signed consent forms authorizing the computer searches.

After inspecting two computers, the agents told the family they needed to take Pagán-González's laptop. Pagán-González's father protested because his son, a college student, needed the computer for his classes, but the agents told the family they could no longer "touch or access" the laptop because it

_____

[3] The second named officer, Agent Claudia I. Bonilla, signed the affidavit submitted with the criminal complaint. The civil complaint in this case also listed as defendants "Unknown Agents of the FBI and/or Federal Task Force 1 to 15," Moreno and Bonilla's husbands, and the two officers' conjugal partnerships.

contained evidence of a crime. The family was not told that the agents had determined that the laptop contained "possible child pornography in the form of graphics, videos, and search terms" ---- as Agent Bonilla later reported in the affidavit for the criminal complaint.

The computer seized from Pagán-González was further examined by the FBI's Computer Analysis Response Team ("CART"). According to the CART report, the laptop contained numerous images and videos of minors engaged in sexually explicit conduct and also revealed that Pagán-González had both received from others and shared child pornography. Agent Bonilla thus prepared the criminal complaint alleging that Pagán-González had transported and received child pornography in violation of 18 U.S.C. § 2252(a)(1) and (2). On December 11, 2013, a magistrate judge issued a warrant for his arrest.

Early the next morning, December 12, Pagán-González and his parents were awakened when armed federal agents "burst into their home" to arrest Pagán-González. He remained in custody until his parents were able to post bond a week later. On January 9, 2014, a federal grand jury indicted Pagán-González for the crimes charged in the criminal complaint. He subsequently filed a motion to suppress the evidence obtained from the search of his computer, arguing that the agents' misrepresentations about their investigative purpose limited or vitiated the consent given by the

family for examination of their computers. Pagán-González asserted that the deception rendered the search "unreasonable and illegal" and, hence, a violation of his Fourth Amendment rights. Instead of responding to the suppression motion, the government filed a motion to dismiss the case "[i]n the interests of justice."

## B. The <u>Bivens</u> Action

On December 12, 2014 -- exactly one year to the day after Pagán-González's arrest -- he and his parents filed this civil lawsuit.[4] Pagán-González alleged that he consented to the officers' entry and search only because the agents stated that they were looking for the source of the "signal and/or viruses" that had been detected in Washington, D.C. Hence, the entry, search, and seizure of the computers violated the Fourth Amendment because they were "tainted by Defendants' lie about the true reason" of "why they were there" and "what they were looking for." The complaint also asserted that Pagán-González's arrest, detention, and indictment violated his Fourth and Fifth Amendment rights because federal authorities relied "exclusively" on the "illegally obtained evidence" from the search to support the charges against him.

---

[4] For the sake of simplicity, we refer to the claims and arguments on appeal as if raised only by Pagán-González. However, his parents --David Pagán-Albino and Isabel González-Torres -- and their conjugal partnership also are plaintiffs-appellants with respect to the search-related claim.

The defendants moved to dismiss the complaint for failure to state a claim. They argued that (1) any claim related to the search itself was time-barred, (2) the agents' entry to plaintiffs' home and search of their computers was lawful, and (3) the agents were in any event protected from liability for the entry and search by the doctrine of qualified immunity. With respect to Pagán-González's allegations of improper arrest, detention, and indictment -- which they characterized as a cause of action for malicious prosecution -- the defendants argued that the claim failed because the criminal charges were supported by probable cause and because "unjustified prosecution" does not give rise to a <u>Bivens</u> claim.[5] The defendants' motion also challenged the factual adequacy of the claims, specifically with respect to Agent Bonilla's involvement in the search and Agent Moreno's involvement in the arrest and prosecution.

The district court dismissed the complaint in its entirety. <u>See</u> <u>González</u> v. <u>Moreno</u>, 202 F. Supp. 3d 220 (D.P.R.

---

[5] In their motion to dismiss, the defendants observed that Pagán-González appeared to invoke only the Fifth Amendment as the basis for the malicious prosecution claim. The district court, however, viewed the malicious prosecution allegations to assert both Fourth and Fifth Amendment violations, but then found that the claim was cognizable only under the Fourth Amendment. <u>See</u> <u>González</u> v. <u>Moreno</u>, 202 F. Supp. 3d 220, 225 n.3 (D.P.R. 2016) (citing <u>Hernandez-Cuevas</u>, 723 F.3d at 94). On appeal, neither party protests the court's approach to the malicious prosecution claim; accordingly, we limit our analysis to the Fourth Amendment.

- 7 -

2016). The court held that the Fourth Amendment claim alleging that the agents unlawfully entered plaintiffs' home and searched their computers accrued on the day those acts occurred, October 23, 2013. Accordingly, it rejected that claim as time-barred because the suit was filed more than a year later, on December 12, 2014 -- i.e., outside the applicable one-year limitations period. Id. at 224. The court treated as timely Pagán-González's claim based on his arrest and the subsequent criminal process, but dismissed that claim as well because "the complaint is devoid of any allegations that would support a finding of lack of probable cause" for the charges brought against him. Id. at 226. Alternatively, the court concluded that the complaint did not provide a sufficient factual foundation to link the named defendants, Moreno and Bonilla, to the post-search criminal process underlying the malicious prosecution claim. See id. at 226-27.

In rejecting the claims, the district court commented that it was "appalled at the allegations that FBI agents would ask to enter [Pagán-González's] home without a warrant, and through a ruse, obtain consent from all family members to search and seize [his] laptop." Id. at 227. Nonetheless, it found meritless "[p]laintiffs' contention that any evidence obtained in violation of [Pagán-González's] constitutional rights would negate the probable cause found in this case." Id. Noting that the

exclusionary rule does not apply in civil cases, the court cited precedent holding that, in the context of a civil malicious prosecution claim, the reliance on unlawfully obtained evidence does not "nullify the officers' probable cause to arrest." Id. (quoting Medina v. Toledo, 718 F. Supp. 2d 194, 207 (D.P.R. 2010), aff'd sub nom. Moreno-Medina v. Toledo, 458 Fed. App'x 4 (1st Cir. 2012)).

**C. The Appeal**

On appeal, Pagán-González challenges the district court's holdings on the statute of limitations, the viability of his malicious prosecution claim, and the agents' entitlement to qualified immunity. Specifically, Pagán-González asserts that the Fourth Amendment claim based on the officers' entry to his home and search of his computer was timely because it did not accrue until the day of his arrest. As for deficiencies in the factual allegations, Pagán-González maintains that he should have been allowed to conduct discovery to ascertain "[t]he specific participation of each agent" in the challenged conduct. He also argues that the malicious prosecution claim should proceed because initiating and prosecuting criminal charges premised solely on illegally seized evidence violates the Constitution, and a reasonable officer would have understood as much.

Appellate review of a district court's grant of a motion to dismiss is de novo. Giragosian v. Bettencourt, 614 F.3d 25, 28

- 9 -

(1st Cir. 2010).  We begin that review in Section II with the district court's ruling on the search-related Fourth Amendment claim.  In Section III, we address the dismissal of the malicious prosecution claim.

## II. The Entry to the Home and the Computer Search

### A. Statute of Limitations

State law determines the statute of limitations for a federal civil rights cause of action, see Barrett ex rel. Estate of Barrett v. United States, 462 F.3d 28, 38 (1st Cir. 2006), and it is undisputed that Puerto Rico's one-year limitations period for personal injury actions applies here, see Roman v. Townsend, 224 F.3d 24, 29 (1st Cir. 2000) (noting "the settled proposition" that plaintiffs' Bivens claim was subject to Puerto Rico's one-year limitations period).  The accrual date for such claims, however, is governed by federal law.  "Under federal law, the statute of limitations on a Bivens claim begins to run when the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of his action."  Barrett, 462 F.3d at 38-39 (quoting Van Tu v. Koster, 364 F.3d 1196, 1199 (10th Cir. 2004)).

Pagán-González argues that the district court erred in finding that the entry-and-search claim accrued when the officers took those actions.  We agree.  On the day of the search, Pagán-González and his parents were told that the agents needed to enter

- 10 -

their home and inspect their computers to address a virus or signal that was detected by authorities in Washington, D.C. They neither knew that day, nor had reason to know, that the agents had misrepresented their purpose and elicited consent to search based on a falsehood.[6] Although they were told that evidence of a crime had been found on Pagán-González's laptop, they could not have known that the evidence related to a crime committed by Pagán-González or to a matter other than the one the agents had identified as the reason they needed to search.

Hence, only when the agents returned on December 12 to arrest Pagán-González on the child pornography charges did he and his parents "know of the existence and cause of the injury which is the basis of [the] action." Barrett, 462 F.3d at 39 (quoting Van Tu, 364 F.3d at 1199). In other words, not until the real purpose for the agents' actions was revealed could Pagán-González understand that the agents had deliberately misled him to elicit consent for a warrantless search -- a tactic he claims invalidated his acquiescence. The limitations period starts running "one day after the date of accrual," Centro Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 6 (1st Cir. 2005), and thus the

---

[6] Agent Bonilla's affidavit states that, during the agents' first visit to his home, Pagán-González acknowledged that "he would download and exchange images and videos of minors engaging in sexual activity." However, Pagán-González has denied making that admission, and, taking the facts in the light most favorable to him, we disregard the asserted admission in assessing the claims.

limitations period for Pagán-González's search-based claim began to run on December 13, 2013. Accordingly, the claim -- filed on December 12, 2014, the one-year anniversary of his arrest -- was timely.

## B. The Merits and Qualified Immunity

Defendants argue that dismissal of the search-related claim should be upheld on the alternative ground that the ruse used by the officers was constitutionally permissible.[7] And, they say, "at the very least, the defendants are shielded from civil liability by qualified immunity." Both of those rationales are in fact components of the qualified immunity analysis. "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" Dist. of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (emphasis added) (quoting Reiche v. Howards, 566 U.S. 658, 664 (2012)). Because we conclude that the officers' deception invalidated the consent given for their warrantless entry and search, thus rendering those actions unlawful, we must also

---

[7] Pagán-González appears to have appealed only the statute-of-limitations ruling on the search claim. However, the government makes no waiver argument concerning the merits and, indeed, it urges us to find in its favor on the validity of the search. We may affirm the dismissal on any ground supported by the record, see, e.g., Flores v. OneWest Bank, F.S.B., 886 F.3d 160, 164 (1st Cir. 2018), and, accordingly, we discuss the merits.

consider the second prong of the inquiry: whether the defendants are nonetheless entitled to qualified immunity because no reasonable officer would have understood that her conduct violated the Fourth Amendment.  See Hill v. Walsh, 884 F.3d 16, 21 (1st Cir. 2018) (citing Wesby, 138 S. Ct. at 589).

## 1. The Consent Exception to the Warrant Requirement

The sanctity of the home is at the core of the Fourth Amendment's protection against unreasonable governmental intrusions.  See Payton v. New York, 445 U.S. 573, 585 (1980) ("[T]he 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" (quoting United States v. U.S. Dist. Court, 407 U.S. 297, 313 (1972))).  The Supreme Court has thus "consistently held that the entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant." Steagald v. United States, 451 U.S. 204, 211 (1981).  Longstanding precedent, however, carves out an exception to the warrant requirement for consensual searches.  See, e.g., Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Coombs, 857 F.3d 439, 448 (1st Cir. 2017).  As one court has noted, "[a] validly obtained and voluntary consent renders a search or seizure reasonable, thus eliminating the need for a warrant." United States v. Parson, 599 F. Supp. 2d 592, 601 (W.D. Pa. 2009).

The Supreme Court has described consent as a "'jealously

- 13 -

and carefully drawn' exception" to the warrant requirement. Georgia v. Randolph, 547 U.S. 103, 109 (2006) (quoting Jones v. United States, 357 U.S. 493, 499 (1958)).  The government thus fittingly bears the burden to prove valid, voluntary consent, see Schneckloth, 412 U.S. at 222; United States v. Vázquez, 724 F.3d 15, 18 (1st Cir. 2013), and courts evaluate voluntariness in this context with the same close scrutiny of the circumstances prescribed by the Supreme Court for assessing the voluntariness of a confession, see Schneckloth, 412 U.S. at 226-27; Coombs, 857 F.3d at 449.  That totality-of-the-circumstances review must take into account, where appropriate, "any evidence that law enforcement officers' fraud, deceit, trickery or misrepresentation prompted defendant's acquiescence to the search."  United States v. Vanvliet, 542 F.3d 259, 264 (1st Cir. 2008); see also, e.g., United States v. Spivey, 861 F.3d 1207, 1213 (11th Cir. 2017) ("Deceit can . . . be relevant to voluntariness."); Vázquez, 724 F.3d at 19 (stating that courts must consider whether law enforcement officers' misrepresentations prompted defendant's consent to the search).[8]

---

[8] We have observed that other

> [f]actors relevant to voluntariness may include, but are not limited to: (i) the consenter's age, education, past experiences, and intelligence; (ii) whether law enforcement officials advised the consenter of his constitutional right to refuse consent; (iii)

Thus, to find the search lawful as the government urges, we must conclude that the consent to enter and search given by Pagán-González and his parents to the FBI agents was "validly obtained and voluntary" notwithstanding the agents' deception concerning their purpose. Parson, 599 F. Supp. 2d at 601. Before evaluating the particular facts here, we describe the existing case law on the use of deception by law enforcement officers, including to obtain consent.

**2. Deception by Government Authorities**

**i. General Principles**

It is beyond debate that deception is a well-established and acceptable tool of law enforcement. See, e.g., Sorrells v. United States, 287 U.S. 435, 441 (1932) ("Artifice and stratagem may be employed to catch those engaged in criminal enterprises."). Indeed, undercover investigations in which government agents misrepresent their identities are ubiquitous and viewed as essential in the detection of crime. See, e.g., Lewis v. United States, 385 U.S. 206, 208-09 (1966) ("[I]t has long been acknowledged by the decisions of this Court that, in the detection of many types of crime, the Government is entitled to use decoys

---

the length and conditions of the consenter's detention and/or questioning; and (iv) law enforcement officials' use of any inherently coercive tactics.

Vanvliet, 542 F.3d at 264 n.2.

and to conceal the identity of its agents." (citations and footnote omitted)); id. at 210 (noting that a prohibition on the use of undercover agents would "severely hamper the Government in ferreting out those organized criminal activities that are characterized by covert dealings with victims who either cannot or do not protest").[9] The right to deceive, however, is not unbounded. "The various protections of the Bill of Rights . . . provide checks upon such official deception for the protection of the individual." Id. at 209.

Consistent with the precedent described above, one such limitation is that government agents' deceptive tactics must not

---

[9] We note that, despite widespread acceptance, not everyone agrees that nondisclosure or an affirmative misrepresentation of a police officer's identity is compatible with a finding that the unknowing or deceived defendant acted voluntarily in interacting with law enforcement. See 2 Wayne R. LaFave et al., Criminal Procedure § 3.10(c) (4th ed. 2017):

> Though some consider even Lewis as objectionable on the ground that we should "regard deliberate deception about an obviously material -- indeed controlling -- fact as inconsistent with voluntariness," a more appropriate concern is that of keeping the above-stated principle within reasonable bounds. One attractive proposal is that permissible deception by a stranger must include a stated intention on his part to join the consenting party in criminal activity, for in that way innocent persons will be spared from intrusions upon their privacy by deception.

(Footnotes omitted.)

prevent a target from making "an essentially free and unconstrained choice" to forgo the constitutional protection of a warrant. Schneckloth, 412 U.S. at 225. In perhaps the most familiar undercover scenario -- a law enforcement officer posing as a drug buyer to gain entry to a home or hotel room -- the deception is deemed acceptable under the Fourth Amendment because the targeted seller has freely made the choice to expose his criminal activity to others. That is, he has voluntarily assumed the risk of inviting individuals whom he knows he cannot control into his residence. See Hoffa v. United States, 385 U.S. 293, 303 (1966) ("The risk of being . . . deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak." (quoting Lopez v. United States, 373 U.S. 427, 465 (1963) (Brennan, J., dissenting))); see also id. at 302 ("Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it."); cf. Lewis, 385 U.S. at 211 ("A government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises for the very purposes contemplated by the occupant.").

The dynamic is meaningfully different, however, when police officers identify themselves as such but misrepresent their

purpose. Because citizens will respond to law enforcement with a sense of obligation and presumption of trustworthiness, multiple courts have held facially consensual searches to be invalid where the "consent" was elicited through officers' lies about the nature or scope of their investigations. See, e.g., United States v. Bosse, 898 F.2d 113, 115 (9th Cir. 1990) (per curiam) (invalidating consent where federal agent investigating possible firearms violations was depicted as a state licensing official: "A ruse entry when the suspect is informed that the person seeking entry is a government agent but is misinformed as to the purpose for which the agent seeks entry cannot be justified by consent."); id. at 115 (stating that "entry . . . acquired by affirmative or deliberate misrepresentation of the nature of the government's investigation" violates the Fourth Amendment (quoting United States v. Little, 753 F.2d 1420, 1438 (9th Cir. 1984))); SEC v. ESM Gov't Sec., Inc., 645 F.2d 310, 316-18 (5th Cir. Unit B May 1981) (holding that federal agent's deliberate, effective misrepresentation of purpose to gain access to records would be impermissible: "When a government agent presents himself to a private individual, and seeks that individual's cooperation based on his status as a government agent, the individual should be able to rely on the agent's representations."); United States v. Tweel, 550 F.2d 297, 300 (5th Cir. 1977) (finding consent vitiated by misrepresentation that investigation was civil, not criminal);

Parson, 599 F. Supp. 2d at 608 (finding government's burden to show voluntary consent unmet where, inter alia, agents investigating child pornography gained entry and searched a computer after advising the defendant he might be a victim of identity theft); People v. Daugherty, 514 N.E.2d 228, 233 (Ill. App. Ct. 1987) ("Where, as here, the law enforcement officer without a warrant uses his official position of authority and falsely claims that he has legitimate police business to conduct in order to gain consent to enter the premises when, in fact, his real reason is to search inside for evidence of a crime, we find that this deception under the circumstances is so unfair as to be coercive and renders the consent invalid."); cf. United States v. Watzman, 486 F.3d 1004, 1007 (7th Cir. 2007) (noting that government did not challenge finding that search was invalid where officers conducted a "phony 'burglary follow-up'" ruse to investigate child pornography); United States v. Turpin, 707 F.2d 332, 334 (8th Cir. 1983) (upholding lawfulness of consent search, but stating that "[m]isrepresentations about the nature of an investigation may be evidence of coercion").

Courts troubled by agents' lies about the searches they seek to conduct have worried that condoning such falsehoods "would obliterate citizens' widely shared social expectations that they may place some modicum of trust in the words of government officials acting as such," with that lack of trust producing

"catastrophic consequences." Parson, 599 F. Supp. 2d at 606. In a passage quoted multiple times by other courts, the Fifth Circuit observed that private individuals have "the right to expect that the government, when acting in its own name, will behave honorably." ESM Gov't Sec., Inc., 645 F.2d at 316. In particular, the court stated, "[w]e think it clearly improper for a government agent to gain access . . . which would otherwise be unavailable to him by invoking the private individual's trust in his government, only to betray that trust." Id.; see also Parson, 599 F. Supp. 2d at 606 ("Society expects that law enforcement officers who present themselves and show badges will be honest and forthright with the community that they serve.").

Yet, despite the broadly framed objections of courts to deception by known government agents, the general consensus in the case law is that such deception, including lying about the purpose of an investigation, is not categorically off-limits in obtaining consent to search.[10] The question instead is whether the deception

---

[10] Multiple commentators, however, have questioned the constitutional validity of officer deception about purpose in seeking consent to search. See, e.g., Laurent Sacharoff, Trespass and Deception, 2015 B.Y.U. L. Rev. 359, 364 (2015) (relying on Supreme Court's trespass analysis in recent Fourth Amendment cases to propose that "when a person lies about her identity and purpose to obtain consent to enter private property, that deception vitiates consent, thereby transforming the entry into a trespass"); id. at 366-67 (stating that police deception should fall within this rule); William E. Underwood, Note, A Little White Lie: The Dangers of Allowing Police Officers to Stretch the Truth as a Means to Gain a Suspect's Consent to Search, 18 Wash. & Lee

in context rendered the consent involuntary.  In a recent Eleventh Circuit decision, for example, the court acknowledged that "fraud, deceit or trickery in obtaining access to incriminating evidence can make an otherwise lawful search unreasonable," Spivey, 861 F.3d at 1214 (quoting United States v. Prudden, 424 F.2d 1021, 1032 (5th Cir. 1970)) (emphasis added in Spivey), but cautioned that deception by officers relying on their status as government agents "does not always invalidate consent," id.; see also id. at 1215 (stating that the ruse used by officers "was a relatively minor deception that created little, if any, coercion").  See also, e.g., People v. Zamora, 940 P.2d 939, 943 (Colo. App. 1996) (upholding trial court's finding of consent "[a]lthough the officers may have partially misrepresented their purpose by not disclosing they were investigating a rape rather than a domestic dispute").

Spivey, in which one panel member dissented,[11] provides

---

J. Civ. Rts. & Soc. Just. 167, 206 (2011) (proposing, as a "workable rule," that when police officers identify themselves as such, they "must fully inform the suspect of the main purpose of their visit in order to validly obtain any consent to search" (emphasis omitted)); Rebecca Strauss, Note, We Can Do This the Easy Way or the Hard Way: The Use of Deceit to Induce Consent Searches, 100 Mich. L. Rev. 868, 882 (2002) (stating that "courts should consider deceit as coercion," and, "[s]ince coercion negates consent, police deception should negate any resulting consent").

[11] The Supreme Court denied certiorari in the case. See Spivey v. United States, No. 17-7046, 2018 WL 2767783 (U.S. June 11, 2018).

a useful illustration of the other considerations that may come into play in assessing the impact of deception by known government agents. There, a pair of defendants sought to suppress evidence of credit card fraud found at their home on the ground that the searching officers had obtained consent to search by falsely claiming to be following up on two burglaries the defendants had reported. See 861 F.3d at 1210. In reality, the burglar already had been caught, and he had told the police about the fraud evidence he had seen at the defendants' home. Id. at 1210-11.

Despite the officers' misrepresentation of their purpose, the panel majority upheld the district court's finding that the consent to search was voluntary. The majority emphasized that one of the defendants had "made a strategic choice to report the burglary and to admit the officers into her home." Id. at 1211. In those circumstances, the judges explained, it was not "clear error for the district court to find that, although the burglary investigation was 'not the main or real reason' for the search, it was 'a legitimate reason for being there.'" Id. at 1214. And, importantly, the consenting defendant "understood that she faced a risk that [the law enforcement agent] would notice evidence of the credit-card fraud." Id. at 1215; see also id. at 1216 ("Austin and Spivey informed the police of the burglaries and invited their interaction. The officers did not invent a false report of a burglary, nor claim any authority that they lacked.").

## ii. Consensus on Impermissibly Coercive Deception

Notwithstanding the need in each case to consider the totality of the circumstances, there is consensus in the precedents that two types of deception have an impermissibly coercive effect. First, the Supreme Court has soundly rejected the consent to search obtained by officers who falsely claim they have a warrant. See Bumper v. North Carolina, 391 U.S. 543, 550 (1968). That situation, the Court explained, is "instinct with coercion" because the officer "announces in effect that the occupant has no right to resist the search." Id. It is thus well established, in our own law and elsewhere, that "deception invalidates consent when police claim authority they lack." Spivey, 861 F.3d at 1213; see also, e.g., Vázquez, 724 F.3d at 22 ("The law is clear . . . that consent to a search is invalid if given only because of an officer's knowingly false assurance that there will soon be a lawful search anyway." (citing Bumper)); Hadley v. Williams, 368 F.3d 747, 749 (7th Cir. 2004) (stating that consent was "vitiated not only by the claim of the police to have a warrant . . . but also by fraud," and explaining that the consent "was procured by an outright and material lie [that the police had a warrant], and was therefore ineffectual").

Second, relying on equivalent reasoning, courts have regularly held that coercion is implicit when officers falsely present a need for urgent action: "[W]hen an officer lies about

- 23 -

the existence of exigent circumstances, he also suggests that the occupant has no right to resist and may face immediate danger if he tries." Spivey, 861 F.3d at 1213 (citing United States v. Harrison, 639 F.3d 1273 (10th Cir. 2011), where "agents falsely implied that a bomb was planted in the apartment they sought to search"); see also United States v. Montes-Reyes, 547 F. Supp. 2d 281, 291 (S.D.N.Y. 2008) (finding lack of consent where officers falsely stated they sought entry to hotel room to search for a missing girl, but planned to search for drugs, because police fabricated a "grave emergency"); Krause v. Commonwealth, 206 S.W.3d 922, 926 (Ky. 2006) (finding coercion where officers obtained consent to search a residence based on a false report that a young girl claimed she had been raped at that location); People v. Jefferson, 350 N.Y.S.2d 3, 4 (N.Y. App. Div. 1973) (per curiam) (finding that "the ruse [of a possible gas leak] used by the police to gain access to the apartment and therefore the subsequent search and arrests were violative of defendant's constitutional rights"); cf. United States v. Hardin, 539 F.3d 404, 424-25 (6th Cir. 2008) (finding that consent would be invalid where apartment manager, acting at behest of police, entered apartment purportedly to investigate a non-existent water leak); Zamora, 940 P.2d at 943 (finding valid consent, but noting that "[t]he police did not feign an emergency, conceal their identities,

or misrepresent their authority").[12]

Beyond the coercion inherent in the false emergency scenario, multiple courts have emphasized "the potential public policy hazard created when police officers make false claims of exigent circumstances." Montes-Reyes, 547 F. Supp. 2d at 288 n.10.

> In order to ensure cooperation in truly life-threatening situations, it is vital to maintain the public trust in emergency services. When the police or the gas company come to the door warning of a real gas leak or other life-threatening emergency, it is in everyone's interest that they be believed. Sanctioning the type of deception engaged in here [phony gas leak] would send a message to all those with reason to fear "the system" (whether they be law abiding or law breaking) that emergency warnings cannot be trusted.

United States v. Giraldo, 743 F. Supp. 152, 154 (E.D.N.Y. 1990) (quoted in Montes-Reyes, 547 F. Supp. 2d at 288 n.10)[13]; see also

---

[12] In United States v. Wei Seng Phua, the court addressed circumstances that it acknowledged did not rise to the level of exigent because the agents "did not lie about an emergency or life-threatening situation." 100 F. Supp. 3d 1040, 1051 (D. Nev. 2015). The agents there had cut off internet service to a hotel room and then posed as repairmen so they could search for evidence of an illegal sports betting operation. Id. at 1045. Nonetheless, the court found that the consent given was invalid. Noting the widespread use of cable, telephone, and internet services, the court concluded that "policy concerns also weigh against allowing the government to use a ruse of this type." Id. at 1052. It observed that "[m]ost reasonable people would invite a third party repair person into their home if they were led to believe it was necessary to fix a problem with those services." Id. Wei Seng Phua also differs from the cases described above, of course, because the government agents disguised their identities.

[13] In Giraldo, the agents were disguised as gas company employees.

Krause, 206 S.W.3d at 926 (stating that, if the court sanctioned ruse of false report of young girl's rape, "citizens would be discouraged from 'aiding to the utmost of their ability in the apprehension of criminals' since they would have no way of knowing whether their assistance was being called upon for the public good or for the purpose of incriminating them" (quoting Schneckloth, 412 U.S. at 243)).  This exigent circumstances extension of "the Bumper coercion principle" is widely recognized.  Laurent Sacharoff, Trespass and Deception, 2015 B.Y.U. L. Rev. 359, 381-82 (discussing the "line of cases" in which "police lie in such a way that the resident feels no choice but to allow the search"); see also 4 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 8.2(n) (5th ed. 2017) (noting that "[t]he critical fact in Jefferson [the gas leak ruse] . . . was that the police in effect deprived the defendant of a free choice in deciding whether to surrender his privacy, for they made it falsely appear that a failure to permit entry might result in injury to persons and property"); Montes-Reyes, 547 F. Supp. 2d at 287-88 (noting "universal[] agree[ment]" that consent is invalid when officers give "the impression that . . . consent cannot be lawfully withheld," and noting cases finding involuntariness when officers invoke "dire or otherwise exigent circumstances" to suggest that "consent to search was required to prevent a[n] impending calamity").

Thus, to sum up, while the fact-specific nature of the voluntariness inquiry makes it difficult to draw many bright lines "within this murky area of law concerning consents [to search] obtained by deception as to purpose," 4 Search & Seizure, supra, § 8.2(n), courts have uniformly recognized that the Fourth Amendment may be violated when consent is obtained through a law enforcement officer's false claim of authority or lies conveying an exigent need for the search. In such instances, the deception may be sufficient on its own to vitiate the voluntariness of the resulting "consent." See Bumper, 391 U.S. at 548-49 (stating that the government's burden of proving that consent was "freely and voluntarily given" "cannot be discharged by showing no more than acquiescence to a claim of lawful authority"); see also 4 Search & Seizure, supra, § 8.2(a) (noting that "[o]ne factor very likely to produce a finding of no consent under the Schneckloth voluntariness test is an express or implied false claim by the police that they can immediately proceed to make the search in any event" (footnotes omitted)); 2 Wayne R. LaFave et al., Criminal Procedure § 3.10(c) (4th ed. 2017) (observing that consent obtained by means of "extreme" misrepresentations that allow no meaningful option to refuse "should not be considered valid"). Indeed, the government in this case recognizes these two categories of cases in which the deception is incompatible with consent. See Appellee's Br. at 15, 16 (recognizing (1) inherent coercion when

officer falsely asserts that suspect has no right to refuse the search and that (2) "an officer may not use a ruse that, if it were true, would give the suspect no real choice but to consent").

### 3. The Challenged Search

Against the backdrop of the law described above, and mindful of "the demanding scrutiny required by the Schneckloth court" in assessing consent, United States v. Twomey, 884 F.2d 46, 51 (1st Cir. 1989), we have little difficulty concluding that the entry and search as alleged in Pagán-González's complaint violated the Fourth Amendment.[14] Roughly ten FBI agents appeared at appellant's door with the alarming news that computers in Washington, D.C. -- the heart of the country's political and military operations[15] -- were receiving signals or viruses from a computer at appellant's location. If the report of a virus infecting technology in the nation's capital was not itself enough to convey an urgent need to address a pressing threat, the show of

---

[14] The voluntariness of appellant's consent is, of course, a fact-based inquiry properly conducted by the district court in the first instance. See, e.g., Vanvliet, 542 F.3d at 264. Accordingly, our discussion addresses only the viability of the Fourth Amendment claim as alleged -- i.e., whether the facts of the search as depicted in the complaint show a Fourth Amendment violation and, if so, whether the defendants are entitled to qualified immunity.

[15] As plaintiffs noted in their opposition to defendants' motion to dismiss, the agents' statement about viruses affecting computers in "Washington" was an "obvious reference to Government computers." Pagán-González v. Moreno, Civ. No. 3:14-01899 (GAG), Dkt. No. 25, at 20 (filed Nov. 2, 2015).

force by the federal agents elevated the seriousness of the situation and communicated that the problematic computer posed a substantial threat -- perhaps even to the nation's security.

To be sure, the fabricated emergency was not one that presented an immediate threat to the personal safety of Pagán-González, his parents, or any particular individual -- as would a gas leak or a bomb.  See supra Section II.B.2.ii.  However, we reject the government's suggestion that a finding of coercion based on fabricated exigent circumstances is limited to lies about an imminent physical danger or "a time-critical investigation involving the well-being of a vulnerable person."  There is nothing fanciful about the havoc that could be wreaked by a computer attack on the federal government.   By late 2013, when the conduct at issue here occurred, cyber security was a major concern within the FBI itself, and the serious threat posed by cyberattacks also was public knowledge.  In March 2012, for example, the FBI's then-top official on cybercrime stated that terrorist groups were "increasingly . . . seeking to use the network to challenge the United States by looking at critical infrastructure to disrupt or harm the viability of our way of life." FBI, Interview with Shawn Henry, https://www.fbi.gov/news/stories/the-cyber-threat (March 27, 2012).  An executive order issued by the White House in February 2013 likewise warned that "[t]he cyber threat to critical infrastructure continues to grow and represents one of the most

serious national security challenges we must confront."  Exec. Order No. 13636, Improving Critical Infrastructure Cybersecurity, 78 Fed. Reg. 11,739 (Feb. 12, 2013), 2013 WL 596302.  Public news accounts included a New York Times story in March 2013 reporting that the nation's top intelligence official "suggested that such attacks now pose the most dangerous immediate threat to the United States, even more pressing than an attack by global terrorist networks."  Mark Mazzetti & David E. Sanger, "Security Leader Says U.S. Would Retaliate Against Cyberattacks," NY Times (Mar. 12, 2013), https://www.nytimes.com/2013/03/13/us/intelligence-official-warns-congress-that-cyberattacks-pose-threat-to-us.html.

In addition, the severity of the purported threat in this instance was made plain by the number of agents dispatched to address it.  Both of these factors -- the claimed threat and the significant show of force -- are consequential in assessing the voluntariness of Pagán-González's consent to enter and search. See 4 Search & Seizure, supra, § 8.2(b) ("It is significant . . . that consent has been obtained while the consenting party was confronted by many police officers."); 2 Criminal Procedure, supra, § 3.10(c) (stating that consent "should not be considered valid" when the fabricated scenario is "so extreme" that the individual cannot fairly assess "the need to surrender his privacy").

Nor do other factors diminish the coerciveness of these aspects of the encounter. Pagán-González's education and family support might have enabled him to resist some types of official deception, cf., e.g., Parson, 599 F. Supp. 2d at 607 (noting, inter alia, that target of identity theft ruse was a 65-year-old with medical issues, including limited ability to see, and was living alone on a low fixed income), but not the sort of fabricated emergency created by the officers in this case. This was not a situation in which government agents were merely offering help to a private citizen. Unlike in Spivey, where the officers were responding to the defendants' request for help, or Parson, where the officers were purporting to protect the defendant from identity theft, the agents here relied on the predictable acquiescence of citizens to assist law enforcement when pressed to do so -- and in a situation where it reasonably could be inferred that national interests were at stake. See, e.g., Krause, 206 S.W.3d at 927 ("What distinguishes this case most, perhaps, from the bulk of other ruse cases is the fact that [the officer] exploited a citizen's civic desire to assist police in their official duties for the express purpose of incriminating that citizen.").

In short, the totality of the circumstances as alleged point strongly to a situation involving "an unwitting, trusting beguilement," Spivey, 861 F.3d at 1216, in which Pagán-González -- pressured by the urgency of the threat posed by the

ruse and intimidated by the agents' en masse arrival -- felt he had no choice but to allow the agents access to his home and computer. Viewing the allegations in the complaint favorably to the plaintiff, the government has not met its burden to prove voluntariness. See Schneckloth, 412 U.S. at 222; Vázquez, 724 F.3d at 18. Absent valid consent, the warrantless entry to Pagán-González's home, and the search and seizure of his computer, violated the Fourth Amendment.

### 4. Qualified Immunity

Having concluded that the search as alleged violated the Constitution, we turn to the second prong of the qualified immunity inquiry: whether the unlawfulness of the agents' conduct was clearly established at the time they acted. See, e.g., Wesby, 138 S. Ct. at 589. In assessing the clarity of the law, we look to "'controlling authority' or a 'consensus of cases of persuasive authority' sufficient to signal to a reasonable officer that particular conduct would violate a constitutional right." Morse v. Cloutier, 869 F.3d 16, 23 (1st Cir. 2017) (quoting Wilson v. Layne, 526 U.S. 603, 617 (1999)). A legal principle can be "clearly established" without factually identical precedent, although the existing case law must have placed the specific constitutional or statutory question "beyond debate." Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)). Put another way, the law must

- 32 -

have been sufficiently clear that "any reasonable official in the defendant's position would have known that the challenged conduct is illegal 'in the particular circumstances that he or she faced.'" Rivera-Corraliza v. Morales, 794 F.3d 208, 214-15 (1st Cir. 2015) (quoting Plumhoff v. Rickard, 572 U.S. 765, 779 (2014)). Such precision ensures that government officials are "penalize[d] . . . for violating 'bright lines,' [but] not for making 'bad guesses in gray areas.'" Id. at 215 (quoting Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992)).

The government argues that the defendants in this case are entitled to qualified immunity because there is no consensus on "what constitutes permissible deception in enforcing the criminal law." Appellee's Br. at 23 (quoting 4 Search & Seizure, supra, § 8.2(n)). Pointing out that the plaintiffs themselves have conceded that "there is no Supreme Court or First Circuit case forbidding agents from using a ruse," the government goes on to characterize this case as one in which "known officers misrepresent[ed] their investigative purpose and claim[ed] to be investigating one crime when they are really investigating another." Id. at 22. "[E]ven if some such ruses may be out of bounds," the government states, law enforcement officers cannot be expected to "identify[] the proscribed variety in advance." Id. at 23.

But the question on which qualified immunity turns in

- 33 -

this case is not whether government agents ever may use a ruse to obtain consent for a warrantless search. Under current law, they clearly may. Hence, plaintiffs' "concession" that ruses have never been prohibited by the Supreme Court or our court is irrelevant to our inquiry. The government likewise misses the mark in pressing the lack of clarity on the lawfulness of ruses in which officers obtain consent by misrepresenting the crime they are investigating. Importantly, the deception that prompted Pagán-González's consent was not simply a lie about the purpose of the agents' search, but it involved fabrication of an emergency. In other words, the facts as alleged implicate the narrow line of cases described above in Section II.B.2.ii. See Mullenix, 136 S. Ct. at 308 (observing that the clearly established "inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition'" (quoting Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001))). The contrast with the facts underlying the Eleventh Circuit's decision in Spivey, where the majority found valid consent, is illustrative of this distinction. See 861 F.3d at 1210-11. There, the officers purported to be investigating burglaries at the request of the homeowners -- a scenario far different from the fabricated emergency precedent.

Hence, the second-prong question we must address is whether the "robust 'consensus of cases'" on fabricated exigent

- 34 -

circumstances put the defendants on notice of the unconstitutionality of their particular ruse. al-Kidd, 563 U.S. at 742 (quoting Wilson, 526 U.S. at 617); see also Wesby, 138 S. Ct. at 590; Rivera-Corraliza, 794 F.3d at 214-15. Even more specifically, we must consider whether a reasonable law enforcement officer would have understood that the false report of a virus threatening computers in Washington, D.C., conveyed to Pagán-González at his home by a force of ten federal agents identified as such, was materially equivalent to the ruses in the fabricated emergency precedent and thus invalidated his consent to search. See generally Mullenix, 136 S. Ct. at 308 (emphasizing that "[t]he dispositive question is 'whether the violative nature of particular conduct is clearly established'" (quoting al-Kidd, 563 U.S. at 742) (emphasis added in Mullenix)).

Essentially for the reasons leading us to conclude that Pagán-González's complaint states a claim for an unlawful search under the Fourth Amendment, we also hold that the virus ruse falls squarely within the "body of relevant case law" in which consent premised on a fabricated emergency was found invalid. Wesby, 138 S. Ct. at 590 (quoting Brosseau, 543 U.S. at 199); see also City of Escondido, Cal. v. Emmons, 139 S. Ct. 500, 503-04 (2019) (per curiam). The clear and primary rationale of this line of precedent is that the consenting individual had no real option to deny access to his home or property because the threat depicted by law

enforcement agents was so imminent and consequential that only immediate access could prevent severe harm. In the "explosion" cases -- involving lies about bombs or a gas leak -- officers used the threat of personal harm and destruction of the individual's residence. See Harrison, 639 F.3d at 1276 (agents falsely reported receiving an anonymous phone call reporting bombs in the apartment); Giraldo, 743 F. Supp. at 153 (agents falsely reported possible gas leak); Jefferson, 350 N.Y.S.2d at 4 (officers falsely stated they were investigating a gas leak). In the cases involving young girls, the need to find a missing child or the accusation of a rape likewise presented scenarios where time was of the essence. See Montes-Reyes, 547 F. Supp. 2d at 291 (observing that "the 'missing girl' ruse . . . created a false sense of exigent circumstances similar to that raised in a 'gas leak' scenario"); Krause, 206 S.W.3d at 926 (involving the fabricated need to search based on the "unnerving news [that] a young girl had just been raped"); cf. Zamora, 940 P.2d at 943 (noting, in finding consent valid where officers seeking perpetrator of thirteen-year-old's rape misrepresented their purpose as investigating a domestic dispute, that "[t]he police did not feign an emergency").

No reasonable law enforcement officer could fail to understand the similar compulsion that is inherent in the lie used in this case. See Wesby, 138 S. Ct. at 590 (noting that, to meet the qualified immunity standard, "there does not have to be 'a

case directly on point,'" but it is necessary to "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment" (quoting al-Kidd, 563 U.S. at 741; White v. Pauly, 137 S. Ct. 548, 552 (2017) (per curiam)). Indeed, the potential impact of the implied cyberattack carried out in part via Pagán-González's computer on the nation's capital was broader than the harms presented in the cases described above -- implicating national security -- and, as we have noted, the threat posed by such an attack was a well-known phenomenon by 2013. See supra Section II.B.3.

Moreover, the precedent further makes plain that surrounding conditions can contribute to the coerciveness of the encounter. In Krause, for example, the court noted the "alarming" timing of the confrontation -- "[a] knock on the door at 4:00 a.m. by uniformed police officers" -- and the target's additional vulnerability because of the "heinous and shameful accusation" that someone in the residence had raped a young girl. 206 S.W.3d at 926. Here, the severity of the threat was clearly communicated to Pagán-González by the arrival on his doorstep of ten federal agents.

Accordingly, every reasonable officer would have understood that the ruse used here, carried out in a manner that signified an emergency, would leave an individual with effectively no choice but to allow law enforcement officers inside his home so

they could attempt to alleviate the grave threat.  And, in turn, a reasonable officer would have known that thus denying Pagán-González a "free and unconstrained choice" to forgo the constitutional protection of a warrant was a violation of his Fourth Amendment rights.  Schneckloth, 412 U.S. at 225.  Indeed, as noted above, the government itself acknowledges the clarity of the rule that "an officer may not use a ruse that, if it were true, would give the suspect no real choice but to consent."  That lack of options is the necessary inference from the facts alleged in Pagán-González's complaint.  Defendants are therefore not entitled to qualified immunity on appellant's search-based Fourth Amendment claim.

### III. Malicious Prosecution

Pagán-González argues that he also has a viable Fourth Amendment claim for malicious prosecution because the defendants relied solely on the evidence obtained in the unlawful search of his computer in arresting and charging him.  As the district court noted, to succeed on a malicious prosecution claim, our case law states that a plaintiff must "establish that: 'the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor.'"  Hernandez-Cuevas v. Taylor, 723 F.3d 91, 101 (1st Cir. 2013) (quoting Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012)).  Pagán-González contends that his

claim meets each of these requirements because, inter alia, the government voluntarily dismissed the criminal proceedings against him (thus, in his view, terminating the prosecution in his favor), and, excluding the unlawfully obtained evidence, his arrest and prosecution were unsupported by probable cause.

The government counters that Pagán-González fails on multiple grounds to state a constitutional claim of malicious prosecution. First and foremost, it challenges Pagán-González's assertion that evidence obtained from an unlawful search may not be used to support a finding of probable cause for arrest, detention, and prosecution. Citing published decisions from other circuits and unpublished decisions of our own court, the government points out that the exclusionary rule has been held to apply only in criminal proceedings. See, e.g., Lingo v. City of Salem, 832 F.3d 953, 960 (9th Cir. 2016) (joining other circuits in "rejecting [§ 1983 plaintiff]'s suggestion that probable cause to arrest may be supported only by information that was obtained in accordance with the Fourth Amendment"); Townes v. City of New York, 176 F.3d 138, 148 (2d Cir. 1999) (holding that "[v]ictims of unreasonable searches or seizures may recover damages directly related to the invasion of their privacy . . . [,] but such victims cannot be compensated for injuries that result from the discovery of incriminating evidence and consequent criminal prosecution"); see also id. at 149 ("The lack of probable cause to stop and search

- 39 -

does not vitiate the probable cause to arrest, because (among other reasons) the fruit of the poisonous tree doctrine is not available to assist a § 1983 claimant."); Machado v. Weare Police Dep't, 494 Fed. App'x 102, 106 (1st Cir. 2012) (per curiam) (noting that evidence arguably seized in violation of the Fourth Amendment "is not subject to the exclusionary rule" in civil proceedings, "and amply provides probable cause to justify [plaintiff's] arrest").

The widespread view that probable cause to arrest or prosecute may be established in civil proceedings with unlawfully seized evidence means that, regardless of our view on the merits of Pagán-González's malicious prosecution claim, the defendants are entitled to qualified immunity on that claim. Put simply, no clearly established law barred the defendants from using evidence obtained in the unlawful search to support probable cause for the criminal charges brought against Pagán-González.

In so concluding, we do not reach the first question of the qualified immunity analysis, i.e., whether Pagán-González might in fact have a viable Fourth Amendment claim stemming from his arrest and pre-trial detention. Pagán-González fails to develop fully an argument that he has satisfied the unsupported-by-probable-cause requirement stated in Hernandez-Cuevas notwithstanding the "real," but unlawfully obtained, evidence of his criminal activity the officers submitted to the magistrate judge. Nor does he suggest an alternative analysis for considering

his unlawful detention claim under the Fourth Amendment, such as the forceful theory of relief described by our colleague in his thoughtful concurrence. See generally Manuel v. City of Joliet, Ill., 137 S. Ct. 911, 919 (2017) (noting that, where a "judge's order holding [arrestee] for trial . . . lacked any proper basis," the "ensuing pretrial detention, no less than [the] original arrest, violated [arrestee's] Fourth Amendment rights"); see also id. at 926 (Alito, J., dissenting) (stating that "malicious prosecution is a strikingly inapt 'tort analog[y],' Wilson [v. Garcia], 471 U.S. [261], 277 [(1985)] for Fourth Amendment violations" (alteration in original)).

Accordingly, the district court properly dismissed the malicious prosecution claim on the ground that defendants are entitled to qualified immunity.

## IV. Conclusion

For the reasons given above, we vacate the dismissal of appellants' search-based Fourth Amendment claim. In remanding for further proceedings on that claim, we leave it to the district court to address both defendants' contention that the complaint fails to adequately allege Agent Bonilla's responsibility for the search and plaintiffs' related request for discovery. We affirm the dismissal of the malicious prosecution claim based on qualified immunity.

Vacated in part, affirmed in part, and remanded for further

proceedings consistent with this opinion. Two-thirds costs to appellants.

**-Concurring Opinion Follows-**

BARRON, **Circuit Judge, concurring**.  I fully agree with the analysis that the majority sets forth to explain why David Pagán-González ("Pagán") states a viable Fourth Amendment claim with respect to the allegedly unconstitutional, warrantless search for which he seeks damages.  I do so notwithstanding the defendants' assertion of qualified immunity.

I also agree with the majority that Pagán has failed to provide us with a basis for overturning the District Court's order dismissing what he styles as his malicious prosecution claim.  In that claim, he seeks damages for the pre-trial detention that he endured and that he contends violated the Fourth Amendment's prohibition against unreasonable seizures.  I agree with the majority that Pagán fails to show, with respect to this claim, that he has alleged a violation of clearly established law, and thus I agree that this claim must be dismissed because it cannot survive the second step of the qualified immunity inquiry.

The choice to resolve a constitutional tort claim with reference only to the second step of the qualified immunity inquiry -- as we do here with respect to Pagán's claim concerning his detention -- is often a sensible one.  There is a risk, however, that such a choice will unduly stunt the development of the law. See Pearson v. Callahan, 555 U.S. 223, 236 (2009) (explaining that first deciding whether there has been a constitutional violation often "promotes the development of constitutional precedent").

- 43 -

Thus, in what follows, I explain why I am of the view that -- absent qualified immunity's obscuring screen -- Pagán has stated a viable claim for damages under the Fourth Amendment with respect to his pre-trial detention.

## I.

Starting on December 12, 2013, Pagán was held in pre-trial detention for five days solely based on an arrest warrant that federal law enforcement agents had procured from a federal magistrate judge after they had filed a criminal complaint against Pagán.  See Fed. R. Crim. P. 4(a).[16]  I focus solely on this period of Pagán's pre-trial detention in assessing his detention-based claim for damages.  I do so because Pagán's complaint, fairly read, plausibly alleges the following.

At least one of the defendants deliberately or recklessly made false statements in an affidavit attached to the criminal complaint.  Those statements misleadingly suggested to the magistrate judge that law enforcement had used constitutionally legitimate means to acquire the sole evidence that formed the basis for the magistrate judge's finding, in

---

[16] At the end of this five-day period, there was a preliminary hearing to determine whether there was "probable cause to believe an offense ha[d] been committed and that the defendant committed it."  Fed. R. Crim. P. 5.1(e).  Pagán does not allege in his complaint what evidence was put forward at this hearing. Accordingly, he has not met his burden to show that his pre-trial detention that ensued in the wake of that hearing violated his constitutional right to be free from unreasonable seizures.

issuing that arrest warrant, of "probable cause to believe that an offense ha[d] been committed and that [Pagán] committed it." Fed. R. Crim. P. 5.1(e).   That evidence consisted of a computer of Pagán's that contained child pornography.

Consider in this regard that Pagán alleges in his complaint that one of the agents who participated in his seizure stated in the affidavit that she attached to the application for the criminal complaint that, "on October 23, 2013, Agents obtained consent to examine two computers," including his own. Consider as well that Pagán also alleges in his complaint that this same agent made that conclusory representation concerning the consensual nature of the examination of the computers, even though she "knew Defendants lied to [Pagán] to secure and obtain the evidence referred to in her Affidavit." Consider, finally, that Pagán's complaint notes that this agent stated in the affidavit attached to the criminal complaint that she "personally participated in this investigation leading to the information contained in this affidavit either through personal investigation or through discussions with other law enforcement personnel."

These allegations are plausible, moreover, in light of our holdings regarding the unconstitutional nature of the search that produced the computer. Recall in this regard that we find that "[n]o reasonable law enforcement agent could fail to understand the . . . compulsion that is inherent in the lie used

in this case" to obtain the evidence -- namely, the computer containing the child pornography -- that formed the basis for the application for the criminal complaint that led to Pagán's detention pre-trial. Panel Op. 37. Recall, too, that we hold that "any reasonable officer would have known that denying Pagán a 'free and unconstrained choice' to forgo the constitutional protection of a warrant was a violation of his Fourth Amendment rights." Panel Op. 38 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973)).

In sum, Pagán has clearly alleged that at least one of the agents involved in effecting his detention deliberately or recklessly misled the magistrate judge into thinking that the sole evidence of probable cause -- the computer -- had been acquired through a constitutionally compliant consensual transfer. But, Pagán has plausibly alleged, that agent was in fact aware that this evidence had been acquired through a clearly unconstitutional coercive ruse.

The consequence of these allegations is that Pagán's detention-based claim brings to the fore at the first step of the qualified immunity inquiry an important legal question. We must decide, at this first step, whether these allegations about this agent's trickery in securing the arrest warrant describe a constitutional violation, such that Pagán may recover damages for his pre-trial detention. We must decide whether those allegations

state such a violation, moreover, notwithstanding that the magistrate judge relied on real evidence of criminal activity to make the probable cause finding that served as the predicate for the issuance of the arrest warrant that resulted in Pagán's seizure and notwithstanding that this real evidence was in fact strong enough to support that probable cause finding.

In my view, these allegations do suffice to state such a violation. To explain why, though, I need to wend my way through an unfortunately complex doctrinal thicket. Only then can I adequately explain why, on the one hand, Pagán fails to show that he has alleged a violation of clearly established law, but, on the other, little logic supports the precedential obstacles that potentially stand in the way of his doing so.

## II.

I begin by winding the clock back more than two decades. That was when the Supreme Court decided Albright v. Oliver, 510 U.S. 266 (1994), which concerned the constitutional tort of malicious prosecution. I then consider the developments that have transpired in the years since Albright that bear on Pagán's case.

## A.

Up until Albright, many lower courts had permitted plaintiffs to recover damages in § 1983 or Bivens actions against law enforcement for the deleterious effects of a baseless criminal prosecution. See Torres v. Superintendent of Police of P.R., 893

F.2d 404, 408 (1st Cir. 1990) (collecting cases). Those effects included, but were not limited to, the harm that the plaintiffs had suffered in consequence of their pre-trial detentions. See, e.g., Raysor v. Port Auth. of N.Y. & N.J., 768 F.2d 34, 39 (2d Cir. 1985) (including "loss of time," "physical discomfort or inconvenience," "mental suffering," and "humiliation" as compensable harms in a malicious prosecution claim) (quoting W. Prosser, Handbook of the Law of Torts 43 (4th ed. 1971)).

Such damages actions were conceived of as ones that sought remedies for violations of an individual's substantive due process rights. See Albright, 510 U.S. at 271. Those actions were not conceived of as ones that sought remedies only for violations of the plaintiffs' Fourth Amendment right to be free from an unreasonable seizure. See id. In fact, the constitutional claims for malicious prosecution that were pursued in these cases were premised on the notion that they could be brought even if the defendants had never been seized at all. See id. at 295-96 (Stevens, J., dissenting). The seizures were thought to be relevant, in other words, merely to the plaintiffs' showings of the damages that flowed from the constitutional violations that inhered in the baseless prosecutions, much as the reputational harms that could befall plaintiffs from the fact of such baseless prosecutions were thought to be relevant to such showings of damages as well. Id.; see also Raysor, 768 F.2d at 39.

- 48 -

The courts that permitted such suits to go forward often drew the elements for what they referred to as the constitutional tort of malicious prosecution from the common law tort of malicious prosecution.  See Albright, 510 U.S. at 296-97, 297 n.10 (Stevens, J., dissenting) (citing W. Keeton, et al., Prosser and Keeton on Law of Torts § 119 (1984)); see also, e.g., Goodwin v. Metts, 973 F.2d 378, 383 (4th Cir. 1992) ("[M]alicious prosecution in violation of section 1983 is [common law] malicious prosecution resulting in a constitutional deprivation."); Ayala-Martínez v. Anglero, 982 F.2d 26, 27 (1st Cir. 1992) (listing constitutional deprivations for purposes of a malicious prosecution claim, including "life, liberty, property," or the violation of "another constitutional right").  In line with the elements of that common law tort, these courts thus routinely required the plaintiffs bringing the constitutional variant of the tort to show two things. They had to show both that the prosecutions that they were challenging had been pursued in the absence of law enforcement having had any probable cause to pursue them and that the prosecutions ultimately had been terminated in favor of the plaintiffs.  See Restatement (Second) of Torts § 653 (providing the elements of common law malicious prosecution).

There was an understandable logic to the strict requirement that, to make out a constitutional claim for malicious prosecution, the plaintiff had to show both that there was no real

evidence of probable cause at the outset and that the prosecution had been terminated in the plaintiff's favor at the close. The gravamen of the constitutional claim was the utter baselessness of the prosecution itself -- not any detention that the plaintiff had been made to endure in the pre-trial period. That seizure -- like the hit to the plaintiff's reputation -- may have inflicted damage for which recovery could be sought. But, that damage was not itself either the source of the constitutional violation or the basis for the constitutional claim.

Thus, the thinking went, if there were evidence of the defendant's criminal activity at the outset -- or, if the defendant's crime could be proven at the close -- then the constitutional claim for malicious prosecution could not succeed. There would be no ground for concluding in such a case that the prosecution had been so baseless as to violate the defendant's substantive due process rights. By contrast, if the plaintiff could show that law enforcement had fabricated the evidence of criminal activity from the get-go and that the prosecution failed at the end, then the constitutional claim for malicious prosecution would be viable.

The inclusion of these two elements of the constitutional tort of malicious prosecution -- the one concerning probable cause and the one concerning favorable termination -- made sense for another reason. Insofar as the federal constitutional

guarantee of substantive due process itself barred such baseless prosecutions, it would have been surprising if that guarantee imposed such a bar even in cases in which the longstanding common law variant of the tort did not.

## B.

Albright changed the legal landscape quite significantly. It did not do so by suggesting that -- insofar as the substantive due process guarantee barred baseless prosecutions -- the requirement that plaintiffs prove either the no-probable-cause element or the favorable-termination element was problematic. See Albright, 510 U.S. at 273-74. Albright instead asked the logically prior question. Did substantive due process really render such a start-to-finish baseless prosecution itself unconstitutional? Albright concluded that, with respect to that question, the answer was, "No." Id. at 271.

Albright's reasoning reflected a concern about expanding the scope of substantive due process. See id. at 271-74. Precisely because the Court relied on that particular line of logic, however, it provided no reason to think that there was a similar constitutional problem with permitting plaintiffs to recover damages for the harm that they suffered in consequence of their pre-trial detention -- even if it had been effected pursuant to legal process in the course of a prosecution -- under a Fourth Amendment-based, unlawful seizure theory. Id. A constitutional

- 51 -

claim of that type raised none of the concerns about expansive notions of substantive due process that had led the Court in Albright to reject the constitutional tort of malicious prosecution more generally.

Albright did not actually go so far as to hold that such detention-focused, Fourth Amendment-based claims were viable. See id. at 274-75. But, in the wake of Albright, a majority of the circuits, including our own in Hernandez-Cuevas v. Taylor, 723 F.3d 91 (1st Cir. 2013), took up the perceived invitation from the Court to recognize this more limited species of the broader constitutional tort of malicious prosecution that Albright had rejected. See Hernandez-Cuevas, 723 F.3d at 99 (collecting cases).

These lower appellate courts held that plaintiffs could bring what these courts continued to refer to as a "malicious prosecution" claim under the Constitution -- and thus, under § 1983 or Bivens -- so long as that claim was based on the Fourth Amendment and thus so long as that claim targeted an actual seizure of the plaintiff. Id. (recognizing a Fourth Amendment claim and collecting cases from other circuits doing the same). These courts thus shifted the focus away from the question of whether the prosecution itself was so baseless that it offended substantive due process to the question of whether the detention that resulted from the prosecution violated the Fourth Amendment because it led to an unconstitutional seizure.

- 52 -

These courts, though, still had to determine what the elements of this newly conceived Fourth Amendment-based malicious prosecution constitutional tort claim would be.  See id. (describing circuit split regarding the elements of such a claim). And, articulating an answer proved to be tricky.

We offered our answer in Hernandez-Cuevas.  Id. at 100-01.  We characterized the constitutional claim itself -- as most courts did -- as one for "malicious prosecution[.]"  Id. at 101.  But, we made clear that the plaintiff would not necessarily need to prove the elements of the common law variant of that tort to make such a claim.  Id. at 100-01.  Instead, we made clear that it was possible that the constitutional version of the claim (now understood to be premised on the Fourth Amendment's protection against unreasonable seizure) might require a different showing. Id.

Ultimately, and presciently, we held that the elements of this type of constitutional tort of malicious prosecution were not dictated by the elements of the common law malicious prosecution analogue.  Id.  For that reason, we did not adopt wholesale the "malice" element that was part of the common law tort of malicious prosecution.  Id.  But, we still did appear to require as elements of the Fourth Amendment-based constitutional tort the two notable ones from the old pre-Albright substantive due process-based malicious prosecution claim that I have

described above.  We determined that such a constitutional tort claim required the plaintiff to show the following elements: "the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor."  Id. (citing Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012)).

Thus, taken literally, Hernandez-Cuevas describes the elements of this Fourth Amendment-based malicious prosecution claim in a way that makes the existence of actual (and sufficiently substantial) evidence that the plaintiff committed the crime fatal to a Fourth Amendment-based tort claim challenging a pre-trial detention that has been carried out pursuant to legal process. See id.  Such evidence would appear to make it impossible for the plaintiff to show that the detention was carried out in the absence of the requisite probable cause.  Hernandez-Cuevas also makes a favorable termination of the prosecution critical to the plaintiff's ability to recover for the harm caused by that detention.  Id.

## c.

This precedential review brings us, then, to the conduct by law enforcement that Pagán alleges occurred in this case.  That conduct occurred after we decided Hernandez-Cuevas, which is no doubt why Pagán relies on Hernandez-Cuevas in arguing that he has stated a claim for damages.  But, given our statement of the

necessary elements of the Fourth Amendment-based malicious prosecution claim in that precedent, I agree with the majority that Pagán has failed to make the case that he has alleged a violation of clearly established law.

Pagán's complaint -- unlike the one in Hernandez-Cuevas itself, 723 F.3d at 95 -- challenges a pre-trial seizure that was based on a finding of probable cause by a magistrate judge that was premised on real and substantial (rather than fabricated) evidence of his criminal activity. To be sure, Pagán does challenge the lawfulness of the means by which law enforcement acquired that evidence -- and the misrepresentations that law enforcement made to the magistrate judge about those means. He does not assert, though, that the evidence itself was fabricated by law enforcement, as was alleged to have been the case in Hernandez-Cuevas, 723 F.3d at 95, or even that the evidence was on its face so patently weak that it was obviously insufficient to make out a finding of probable cause.

Nor does Pagán develop any argument as to how, notwithstanding the existence of real and substantial evidence of his criminal conduct, his claim is nonetheless one that clearly satisfies the probable cause element that Hernandez-Cuevas appears to have established. See id. at 100-01. Nor, moreover, does he even develop any argument as to why his claim does not need to be

of that kind in order for it to survive the second step of the qualified immunity inquiry.

Thus, I agree with the majority that -- at least given the arguments that Pagán makes to us -- Hernandez-Cuevas poses an insuperable obstacle to his claim going forward.  Accordingly, I join the majority's holding at step two of the qualified immunity inquiry.  Panel Op. 39-41.

There has, however, been yet another change in the relevant legal landscape, although this one occurred only after the initiation of Pagán's case.  It thus does little to help Pagán meet the "clearly established law" prong of the qualified immunity inquiry, at least given the arguments that he makes to us. Nevertheless, this change does suggest to me that it would be a mistake to make too much of the obstacle that seemingly stands in the way of Pagán's claim with respect to similar claims that may be brought by others.  Thus, in the remainder of my analysis, I explain my reasons for so concluding.

## III.

The post-Hernandez-Cuevas legal change that I have in mind was brought about by the Supreme Court's recent decision in Manuel v. City of Joliet, Ill., 137 S. Ct. 911 (2017).  An implication that I draw from Manuel is that it does not make sense to continue to treat a Fourth Amendment-based claim for damages resulting from an unlawful seizure effected via pre-trial

detention of a criminal defendant as if it were one for "malicious prosecution."  A further implication that I draw from Manuel is that we are not obliged to borrow the elements from the common law -- or substantive due process -- tort of malicious prosecution when considering a Fourth Amendment-based claim that is brought for damages for the harm caused by such pre-trial detention.

To support the first of these conclusions, I note that the Supreme Court granted certiorari in Manuel on the question of "whether an individual's Fourth Amendment right to be free from unreasonable seizure continues beyond legal process so as to allow a malicious prosecution claim based upon the Fourth Amendment." Id. at 923 (Alito, J., dissenting) (emphasis in original).  Yet, the Court held, "Manuel may challenge his pretrial detention on the ground that it violated the Fourth Amendment," even though it occurred "after the start of 'legal process[,]'" id. at 914 (majority opinion), without ever referring to such a claim as one for "malicious prosecution[,]" see id. at 914-22.

Moreover, Manuel remanded to the Seventh Circuit to consider "the elements of, or rules applicable to" Manuel's claim, without purporting to set forth the elements from the traditional tort of malicious prosecution or to answer the timeliness question by applying the special accrual rules from the common law variant of the malicious prosecution tort.  Id. at 922.  In fact, even though Justice Alito in dissent asserted that the elements of

common law malicious prosecution are entirely inconsistent with a Fourth Amendment claim like Manuel's, id. at 925-26 (Alito, J., dissenting), the majority did not attempt to rebut these arguments at all in permitting the claim to go forward, see id. 912-22 (majority opinion).

In addition to the fact that Manuel eschews the "malicious prosecution" label, it also supports the implication that I draw from it that courts need to examine claims such as the one that Pagán brings through the lens of the Fourth Amendment rather than through the lens of the common law tort of malicious prosecution. Although Manuel expressly encourages us to "look first to the common law of torts" to define the elements of a § 1983 claim, it explains that those "[c]ommon-law principles are meant to guide rather than to control the definition of § 1983 claims,[17] serving 'more as a source of inspired examples than of prefabricated components.'" Id. at 920-21 (quoting Hartman v. Moore, 547 U.S. 250, 258 (2006)). The Court then proceeds to admonish us to "closely attend to the values and purposes of the constitutional right at issue" when "applying, selecting among, or adjusting common law-approaches." Id. at 921.

---

[17] We look to the common law for guidance in Bivens cases, as well. See Hernandez-Cuevas, 723 F.3d at 101 (citing Albright, 510 U.S. at 277 n.1 (Ginsburg, J., concurring)).

Thus, it is with this fresh guidance from <u>Manuel</u> in mind that I now consider whether the Fourth Amendment claim that <u>Manuel</u> recognizes encompasses a claim like Pagán's. For the reasons set forth below, I conclude that it does. I do so despite the fact that the evidence that the magistrate judge relied upon to issue the arrest warrant that permitted Pagán's seizure was both real and sufficient to establish the requisite probable cause. I do so, as well, even though the analogous evidence of probable cause in <u>Manuel</u> allegedly had been fabricated by law enforcement, just as it allegedly had been fabricated in <u>Hernandez-Cuevas</u>.

**A.**

As <u>Manuel</u> recognizes, a claim of the kind that Pagán brings is necessarily predicated on a challenge to whether the seizure at issue comports with the Fourth Amendment. The focus, therefore, should be on discerning the elements of the constitutional tort that logically relate to the constitutional right -- namely, the Fourth Amendment prohibition against unreasonable seizures -- on which the tort is grounded. <u>Id.</u> at 920-21.

Such a focus, however, makes it mysterious to me why we would continue to define the elements of the claim as <u>Hernandez-Cuevas</u> -- at least at first blush -- presently does. <u>See</u> <u>Hernandez-Cuevas</u>, 723 F.3d at 100-01. I start with the favorable termination element, which <u>Hernandez-Cuevas</u> retains from the old,

- 59 -

pre-Albright constitutional tort of malicious prosecution based on the common law tort.  Compare id., with Restatement (Second) of Torts § 653.  I then consider the element concerning probable cause, which Hernandez-Cuevas retains from the earlier version of the tort as well.

With respect to making favorable termination an element of the Fourth Amendment-based tort, such as the one that Pagán brings, I see little reason to retain that element post-Manuel. The termination of the prosecution -- even if unfavorable to the defendant -- cannot render the pre-trial seizure of the defendant constitutional if that seizure was unlawful from the inception. No matter how the prosecution ends -- including if it ends in a conviction -- the defendant still has a right for there to have been a constitutionally valid basis for the pre-trial detention that he endured.  Thus, the favorable termination element -- an artifact of the old, no longer viable substantive due process-based malicious prosecution constitutional tort -- seems to me to be an anachronism.  Accord Manuel, 137 S. Ct. 925-26 (Alito, J., dissenting).

I reach the same conclusion with respect to the element concerning probable cause -- at least if we understand that element to require a showing that the magistrate judge's finding of probable cause that grounded the seizure was predicated on evidence that law enforcement fabricated or that was so patently weak that

it could not plausibly support a probable cause finding.  I add this caveat about whether Hernandez-Cuevas actually meant to establish a definitive holding about the requirements of the probable cause element for the following reason. In Hernandez-Cuevas, the only evidence of probable cause had -- allegedly -- been fabricated by law enforcement.  723 F.3d at 95.  Thus, we had no occasion there to decide -- definitively -- whether the probable cause requirement that we set forth was intended to require the plaintiff to show that there was simply no real evidence sufficient to establish probable cause at all.  It was enough to conclude that the claim could go forward when the plaintiff had made that showing by virtue of the allegations concerning fabrication.

But, insofar as Hernandez-Cuevas does establish a probable cause element of a strict kind, I do not see why it is right to do so given the recent guidance that we have received from Manuel.  Here, too, my concern is that the element is being defined with reference to the old, now-rejected malicious prosecution constitutional tort, rather than with reference to the Fourth Amendment-based tort, which is the only variant of that tort that remains viable after Manuel.

There is a logic to requiring the prosecution to have been based on real evidence of a crime at the outset if the constitutional claim targets the bringing of the prosecution itself.  There is no similar logic, though, to imposing that

requirement if the constitutional claim challenges only the seizure that occurred in connection with that prosecution.

To see why, we need only follow Manuel's admonition that, in discerning the elements of this Fourth Amendment-based tort, we must keep our eye on the underlying constitutional right. Manuel, 137 S. Ct. at 920-21. A consideration of that right, as I shall next explain, reveals that even real and substantial evidence of probable cause -- such as is present in Pagán's case -- may be insufficient to render an arrest warrant that is issued based on that evidence one that law enforcement may constitutionally rely upon to carry out the ensuing seizure.

### B.

The Fourth Amendment provides that "no Warrants shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Importantly, for present purposes, the Supreme Court has explained that the Amendment's protection consists of more than the requirement of probable cause. Rather, the Court has explained, "[t]he bulwark of Fourth Amendment protection, of course, is the Warrant Clause, requiring that, absent certain exceptions, police obtain a warrant from a neutral and disinterested magistrate before embarking upon a search." Franks v. Delaware, 438 U.S. 154, 164 (1978).

Further, the Court emphasized in Franks that "it is the magistrate who must determine independently whether there is probable cause" in a case where a warrant would be required and thus "it would be an unthinkable imposition upon his authority if a warrant affidavit, revealed after the fact to contain a deliberately reckless false statement, were to stand beyond impeachment." Id. at 165 (emphasis added). And, finally, Franks applies equally to arrest warrants issued by a magistrate judge pursuant to a criminal complaint as to search warrants. See Burke v. Town of Walpole, 405 F.3d 66, 82 (1st Cir. 2005).

Thus, a showing of probable cause is not the only prerequisite to a lawful seizure of a criminal defendant -- by reason of his suspected criminal activity -- under the Fourth Amendment. Rather, per Franks, the probable cause showing is necessary but not sufficient, because, in many circumstances, a defendant's seizure may be constitutionally carried out only pursuant to an arrest warrant issued by a neutral magistrate judge. Franks, 438 U.S. at 164.

Moreover, in those circumstances in which a warrant is required, the seizure does not necessarily comply with the Fourth Amendment simply because law enforcement carried it out pursuant to such a warrant. Rather, even in that event, the seizure may be challenged on Fourth Amendment grounds, as Franks shows, too.

To be sure, even a defective arrest warrant -- say, one resting on evidence too slight to establish probable cause -- may legitimate the conduct of officers who, in good faith, effect an arrest pursuant to that defective warrant. The good faith exception to the warrant requirement ensures this outcome. United States v. Leon, 468 U.S. 897, 920-23 (1984); see also United States v. Barnes, 895 F.3d 1194, 1201-02 (9th Cir. 2018) (applying Leon's good faith exception to an arrest warrant acquired via criminal complaint). But, there are cases in which law enforcement may not rely on an arrest warrant in good faith, and those cases include ones in which "the magistrate . . . in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." Leon, 468 U.S. at 923 (citing Franks, 438 U.S. at 154).

The logic underlying the precedent that limits the good faith exception is clear enough. An arrest warrant can legitimate a seizure premised on a warrant that in fact lacks probable cause. An arrest warrant cannot legitimate a seizure under the Fourth Amendment if law enforcement precluded the magistrate judge from performing the neutral gatekeeping role required of it by the Warrant Clause. In such circumstances, the warrant cannot provide a good faith basis for law enforcement to think that the seizure

- 64 -

was lawful due to the trick on the magistrate judge that was used to secure the warrant.

Against this legal background, Hernandez-Cuevas and Manuel were hardly innovative in permitting Fourth Amendment-based damages claims to proceed where the plaintiff alleged that his pre-trial seizure had been carried out pursuant to an arrest warrant that the magistrate judge issued based on evidence of probable cause that law enforcement had fabricated. Manuel, 137 S. Ct. at 914-15, 920 n.8; Hernandez-Cuevas, 723 F.3d at 102-03. In such circumstances, the warrant clearly could not legitimate the seizure, given the trick that law enforcement had performed on the magistrate judge that led the magistrate judge to issue the warrant.

The question for our purposes, though, is not quite so easily answered as it was in those cases. The trickery in Manuel and Hernandez-Cuevas led the magistrate judge to issue a warrant based on evidence of probable cause that simply did not exist and that law enforcement knew from the outset did not exist. In a case like Pagán's, by contrast, law enforcement has not tricked the magistrate judge into believing that there was evidence of probable cause when there in fact was none. There was such evidence all along. Rather, law enforcement has -- allegedly -- merely tricked the magistrate judge into believing that the

evidence of probable cause was constitutionally acquired when law enforcement knew it was not.

As I read our precedent, however, where officers trick the magistrate judge about the unlawfully acquired nature of the evidence that they have put forward to establish probable cause, the resulting warrant is no less premised on a lie or reckless half-truth that materially taints the magistrate judge's capacity to perform the constitutionally prescribed gatekeeping role than when the deceit concerns the existence of the evidence. Thus, law enforcement's ability to rely on that warrant in good faith to justify the seizure may be limited just as it would be in a case in which the lie or reckless untruth does concern the evidence's existence.

Specifically, we have explained that a warrant -- even if predicated on evidence that was itself real -- may not be relied upon by law enforcement, if it had been secured by deliberate lies or reckless omissions that misled the magistrate judge into thinking that critical evidence of probable cause had been acquired constitutionally or with a good faith belief that it had been. See United States v. Diehl, 276 F.3d 32, 43 (1st Cir. 2002). We have done so, presumably, on the understanding that a fully informed magistrate judge might have exercised its discretion to decline to issue the warrant had it known that the evidence of probable cause had been secured only through law enforcement

conduct that was not constitutional or that was not undertaken in good faith that it was. In fact, our precedent, like the precedent of other circuits, makes clear that a magistrate judge may decline to issue a warrant when the evidence forming the basis for probable cause is known to have been acquired in such concerning circumstances. See United States v. Bain, 874 F.3d 1, 21-22 (1st Cir. 2017) (collecting cases).[18] Thus, lies or reckless omissions that hide facts that would reveal such problematic means of acquiring such evidence -- like the lies alleged by Pagán -- interfere with the magistrate judge's constitutional role as a gatekeeper. See Franks, 438 U.S. at 155-56.

In Bain, for example, we held that a search warrant could be issued based on unconstitutionally acquired evidence of probable cause obtained in a prior search if that prior search had been conducted on a "good faith" belief that it was conducted constitutionally. Bain, 874 F.3d at 22.[19] In doing so, we

---

[18] The only two circuits to take a different approach have adopted a per se rule precluding a magistrate judge from relying on unlawfully acquired evidence when evaluating whether there is probable cause for a warrant to issue. See United States v. McGough, 412 F.3d 1232, 1239-40 (11th Cir. 2005); United States v. Wanless, 882 F.2d 1459, 1466-67 (9th Cir. 1989).

[19] In that case, without deciding that it was the correct formulation of the test for "good faith," we applied the Eighth Circuit's formulation that the prior search must have been "close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable." Bain, 874 F.3d at 22 (quoting United States v. Hopkins, 824 F.3d 726, 733 (8th Cir. 2016)).

reaffirmed our reasoning in Diehl. There, we explained that officers would be barred from relying on a search warrant that a magistrate judge issued based on evidence acquired from a prior warrantless search, if the application for the follow-on search warrant omitted facts that the defendant alleged would have shown the prior search to have been undertaken not merely unlawfully but in "such bad faith to preclude a warrant." Diehl, 276 F.3d at 43 (citing United States v. Reilly, 76 F.3d 1271, 1280 (2d Cir. 1996) (barring reliance on a warrant in such circumstances (citing Franks, 438 U.S. at 155-56))).

Franks itself, I should add, supports the same conclusion. It concerned misrepresentations by officers about whether certain statements -- necessary for a finding of probable cause by the magistrate judge -- had been made to officers in violation of the defendant's rights under Miranda v. Arizona, 384 U.S. 436 (1966). Franks, 438 U.S. at 156-57. Franks itself, in other words, precluded law enforcement from relying on a search warrant that had been secured through misrepresentations to the magistrate judge, even though the evidence of probable cause on which the magistrate judge relied in issuing the warrant was real (though, I suppose, arguably unreliable). Id. And, of course, we have held Franks to apply equally to the acquisition of arrest warrants by criminal complaint. See Burke, 40 F.3d at 82.

Thus, the following would appear to be clear, at least under our precedent. When law enforcement intentionally or recklessly makes false statements to a magistrate judge about the constitutional or good faith means by which law enforcement obtained the evidence that supplies the basis for finding the probable cause necessary to justify the warrant that would permit a pre-trial seizure of a criminal defendant, such lies -- or reckless omissions -- undermine the magistrate judge's ability to perform its constitutional role under the Warrant Clause. See Franks, 438 U.S. at 155-56. Such intentionally false statements or reckless omissions thus preclude law enforcement officers from relying in good faith on the arrest warrant that is then issued (at least when the officers know of the lies or reckless omissions). And thus, under our precedent, such lies or reckless omissions prevent that warrant from legitimating the seizure that is carried out in reliance on it, Leon, 468 U.S. at 923 (citing Franks, 438 U.S. at 154), notwithstanding that the lies or reckless falsehoods concerned only the means by which the evidence of probable cause had been acquired and not the existence of the evidence itself.

## C.

Against this legal backdrop, I do not see why a plaintiff should be barred from seeking damages for his pre-trial seizure, simply because he can show that the lies or the reckless omissions

that law enforcement told the magistrate judge to secure the arrest warrant concerned only how real evidence had been acquired and not whether such real evidence existed.  The deceit still stripped the magistrate judge of the ability to perform its constitutionally prescribed gatekeeping role.  The deceit did so by stripping the magistrate judge of the opportunity to deny law enforcement the ability to exploit the unconstitutional conduct it used to acquire the evidence that supplies the sole basis for procuring the warrant that would permit a defendant to be seized.  Under our precedent, therefore, the seizure would appear to be no less unconstitutional -- insofar as the warrant is necessary in the first place -- for having been carried out pursuant to unconstitutional trickery of that comparatively subtle (but still egregious) sort.  Cf. Manuel, 137 S. Ct. at 918 (noting that the Fourth Amendment's prohibition on "government officials . . . detaining a person in the absence of probable cause" may "also occur when legal process itself goes wrong").

Nor would such a conclusion be unique.  There is some precedent that recognizes that the old "probable cause" element -- as developed in connection with the pre-Albright constitutional tort of malicious prosecution -- should not be construed to require a showing that the finding of probable cause rested on fake rather than real evidence.  For example, in Boyd v. City of New York, 336 F.3d 72 (2d Cir. 2003), the Second Circuit

- 70 -

considered a case in which the officers lied repeatedly, both to the grand jury and at a suppression hearing, about whether key testimony by the defendant had been given in violation of <u>Miranda</u>. <u>Boyd</u>, 336 F.3d at 74. There was no contention in <u>Boyd</u> that the criminal defendant's statements were false, only that officers knew them to be inadmissible at the eventual trial. <u>Id.</u> Yet, rather than consider only whether there was real evidence of probable cause to believe Boyd had committed a crime -- as was the standard, pre-<u>Albright</u> inquiry -- the Second Circuit expanded the probable cause inquiry to allow that element to be satisfied even when there was real evidence of probable cause. <u>Id.</u> at 74 n.7.

Thus, even before <u>Manuel</u>, at least one circuit appeared to be grappling with the apparent mismatch between the elements of existing, substantive due process malicious prosecution claims and the new Fourth Amendment-based claim challenging the seizure alone. In my view, that circuit was right to be doing so.

Consider a case in which law enforcement bribed the magistrate judge to rule its way in assessing whether debatable but real evidence -- say, officer testimony in which credibility determinations are paramount -- could suffice to permit the seizure. The victim of that misconduct should not be barred from seeking recompense for the harm that he has endured from the resulting detention. There, the evidence of probable cause itself would not have been fabricated. Nor might it even have been so

- 71 -

patently weak as to preclude an officer from relying in good faith on a warrant based on it. Nevertheless, the detainee would still have been deprived of his Fourth Amendment right to have a neutral magistrate judge -- rather than an interested executive actor -- assess whether the detention was justified.[20]

The situation, it seems to me, is no different if the magistrate judge was misled into believing that the evidence of probable cause had been acquired consensually rather than pursuant to a ruse that the officers knew to be unconstitutionally coercive. Such deceit -- even if it inheres only in a reckless omission, rather than a deliberate untruth, and even if it concerns the means of acquisition rather than the evidence's actual existence -- prevents the magistrate judge from performing its constitutionally contemplated role as a neutral adjudicator of whether detention is warranted. See Franks, 438 U.S. at 165. That is so, under our precedent, notwithstanding that this deceit

---

[20] I note in this regard that, although our review of a District Court's legal conclusions on a motion to suppress, "including its conclusion regarding the existence of probable cause, [is] de novo," United States v. Clark, 685 F.3d 72, 75 (1st Cir. 2012), we also afford "great deference" to "[a] magistrate's determination of probable cause[,]" id. at 78. This is especially so where the probable cause determination rests on factual findings or credibility determinations. Id. at 75, 78. Thus, such a bribe would appear to short-circuit the gatekeeping process, at least in a case in which the probable cause finding would itself depend on fact finding by the magistrate to which we would otherwise defer.

concerns only how law enforcement acquired the evidence of probable cause and not whether the evidence exists.

**D.**

Allowing claims like Pagán's to proceed would not mean that constitutional tort suits could be used to attack arrests based on warrants as a general matter. Leon still shields officers where they rely on warrants in good faith, except in very limited circumstances, such as Franks violations in securing the warrant. Leon, 468 U.S. at 923 (citing Franks, 438 U.S. at 154). But, when the officers' reliance on that warrant is in bad faith -- such as when the officer who participates in the seizure is also responsible for the reckless or deliberate misrepresentations that led to the warrant's tainted issuance -- I do not see why the specter of a damages judgment should not be in the offing.

This approach is also entirely consistent with the prevailing view that the exclusionary rule does not apply to civil proceedings. See Lingo v. City of Salem, 832 F.3d 953, 960 (9th Cir. 2016); Townes v. City of New York, 176 F.3d 138, 148 (2d Cir. 1999). Under this approach, the inquiry is not whether the evidence shows that there was probable cause to believe the plaintiff had committed a crime. The inquiry is whether law enforcement precluded the magistrate judge from performing its constitutionally assigned gatekeeping role through deliberate lies or reckless omissions about the means used to acquire the evidence

- 73 -

of probable cause.  Thus, as the Fourth Amendment-based tort claim does not depend on guilt or innocence or on whether the improperly procured evidence was real or fake, the plaintiff does not need to exclude the evidence of probable cause to win.  The plaintiff needs only to put forward facts sufficient to show a Franks violation.

In addition, in all § 1983 cases and Bivens actions, plaintiffs must show some causation between the defendant's conduct, the constitutional violation, and the plaintiff's injury.  See Martinez v. California, 444 U.S. 277, 285 (1980) (holding that the language of § 1983 imposes a proximate cause requirement on claims under that statute); Hernandez-Cuevas, 723 F.3d at 100 (requiring a showing of causation in Bivens actions).  As we explained in Hernandez-Cuevas, "in most cases, the neutral magistrate judge's determination that probable cause exists for the individual's arrest is an intervening act that could disrupt any argument that the defendant officer had caused the unlawful seizure."  Id. at 100 (citing Sanchez v. Pereira-Castillo, 590 F.3d 31, 50 (1st Cir. 2009) ("We employ common law tort principles when conducting inquiries into causation under § 1983.")).  We noted, too, that this "causation problem" can be overcome only if it is clear that law enforcement officers were "responsible for [the plaintiff's] continued, unreasonable pretrial detention," including by "fail[ing] to disclose exculpatory evidence" or "l[ying] to or misle[ading] the prosecutors."  Id.

For these reasons, I conclude that Pagán has sufficiently stated a claim for damages under the Fourth Amendment -- save, that is, for the qualified immunity defense that bars that claim from surviving here. The lack of clarity in our precedent or the Supreme Court's as to the elements of such a claim precludes him from overcoming that defense -- at least given his arguments to us. I recognize that this caveat concerning qualified immunity is a rather significant one -- and not only in Pagán's case. The defense of qualified immunity is usually invoked in cases like this one, just as it has been invoked here. A plaintiff who loses at the second step of the qualified immunity inquiry is no better off than one who loses at the first step.

Still, it is important to address the first step of the qualified immunity inquiry. That step is certainly relevant in cases in which the defense of qualified immunity is not properly invoked -- and, in fact, it was not invoked in either Hernandez-Cuevas or Manuel. Hernandez-Cuevas, 723 F.3d 97, 97 n.7; see generally Manuel, 137 S. Ct. at 914-22.

With respect to that step, moreover, it is clear to me that, in light of Manuel, it is a mistake to attempt to fashion a half-fish, half-fowl, hybrid malicious prosecution/Fourth Amendment based tort. I thus do not see how, post-Manuel, we could continue to justify treating a Fourth Amendment-based claim such

as Pagán brings here -- targeting, as it does, only the seizure and not the prosecution -- as a species of the old malicious prosecution tort.  Rather, we must understand that tort for what it is -- a Fourth Amendment-based challenge to pre-trial detention that targets law enforcement's efforts to circumvent the warrant requirement through lies or reckless omissions that conceal from the magistrate judge facts material to its ability to perform its constitutionally assigned role.

For that reason, I think it important to lay out this analysis here.  That way, in a subsequent case we will be better positioned to resolve definitively how Manuel bears on -- and, in my view, supersedes -- two of the elements of the constitutional tort that we described in Hernandez-Cuevas: the ones concerning favorable termination and probable cause.  See Hernandez-Cuevas, 723 F.3d at 100-01.

Unless we at some point address step one of the qualified immunity inquiry in a case involving such a claim, or otherwise definitively define the elements of this constitutional tort post-Manuel, we will be at risk of leaving the law unclear in key respects.  In consequence, we will be permitting our pre-Manuel case law to exert an outsized influence on the types of remedies that may be available to those who have been the victims of unlawful law enforcement trickery of the kind that the Fourth Amendment quite clearly condemns.

Finally, and relatedly, I would not rule out the possibility that, even before our court does provide clarity to the doctrine in this area, a plaintiff might be able to develop an argument -- which Pagán has not attempted to do here -- as to why such a claim might be viable even in the face of a qualified immunity defense. Our Fourth Amendment precedents in Bain and Diehl clearly establish that law enforcement officers -- per Franks -- may not rely on warrants in good faith that are the product of their own reckless half-truths about the constitutionality (or the officers' good faith belief in the constitutionality) of the means used to acquire the evidence of probable cause on which the magistrate judge relied in issuing the warrant. Nor does Hernandez-Cuevas suggest otherwise. Rather, Hernandez-Cuevas at most creates doubt about the content of one element of the constitutional tort suit that may be brought to recoup damages for the harm caused by the pre-trial detention that results from such clearly unconstitutional law enforcement conduct.

Given that qualified immunity is intended to serve a practical, functional purpose, I am not certain that law enforcement officers should be immune from damages for engaging in conduct that, at the time it was undertaken, was clearly unconstitutional under our precedent, simply because we had not also as of that time clearly described an element of the

- 77 -

constitutional tort that may be brought to recover damages for the harm caused by such conduct. We have no occasion, however, to consider such a refined question of qualified immunity law here. I thus leave it for another day.

For present purposes, it is enough to lay out the lines along which the relevant doctrine may be reconstructed. Doing so is the first step along the route to ensuring that this body of doctrine is freed from the lingering influence of the pre-Albright tort of malicious prosecution and thus may reflect more fully Manuel's suggestion that we "closely attend to the values and purposes of the constitutional right at issue" when "applying, selecting among, or adjusting common law-approaches." Manuel, 137 S. Ct. at 921.